DUFPHEY *VS* FRENAYE.

5sp 215|
130  659|

1. Where a sale of real estate has been made by a first purchaser, to a second *bona fide* vendee, *without notice of incumbrances*, upon valuable consideration, and no conveyance has been made, or any part of the purchase money paid; Chancery will arrest the entire subsequent sale, and sustain the lien of the original vendor, for the purchase money, upon the premises sold.

2. But, in such case, where part of the purchase money is paid by the second vendee, and the possession and title deeds have passed to him, he will be protected in Chancery, to the amount of all advances made in consideration of the purchase, *before notice of an incumbrance*, [and, *it would seem*, in *some* cases, to the extent of valuable improvements,] against the lien of the original vendor, who may have taken an incumbrance for the purchase money, but failed to give notice, either actual or constructive.

3. A, having purchased real estate from B, executed notes for the purchase money, and a mortgage to secure the payment, which was acknowledged before *one* justice of the peace, and recorded in the office of the clerk of the County Court. Afterwards, before the payment of the purchase money, A. being in possession, made a *bona fide* sale of the premises, to C, upon valuable consideration, and placed C in possession, receiving part of the purchase money, and executing unconditional title deeds; without notice to C, of the lien of B. C, subsequently being informed of B's lien, agreed with A, to withhold the payment of the instalments due by C, until the sequel of B's claim; who filed a bill, praying a foreclosure of his mortgage, and a sale of the lands for the discharge of his lien: on this bill it was held—

1st. That the recording of the mortgage taken by B, under the acknowledgment before *one* justice of the peace, could not operate as notice to C, of the incumbrance upon the lands.

2nd. That the lands should be sold by the master in Chancery, (giving C time to discharge the amount of the incum-

brance,) and the proceeds, after *first* discharging the amount advanced by C, before notice of the incumbrance, applied to the payment of the sum due B, under the mortgage.

Error to the Circuit Court of Greene, exercising Chancery jurisdiction.

This was a bill in Chancery, filed to the Fall term, 1825, of Greene Circuit Court, by Peter Frenaye, for the object of foreclosing a mortgage.

The bill stated, that, on the twenty-fifth day of May, one thousand eight hundred and twenty-two, orator bargained and sold to one John M'Kinne, then of the County of Greene, and Srate of Alabama, certain parcels of lands, which he held, under an act of Congress, passed on the third day of March, one thousand eight hundred and seventeen, entitled, "An act to set apart and dispose of certain public lands, for the encouragement of the cultivation of the vine and olive;" and a contract made pursuant to the said act, on the eighth of January, one thousand eight hundred and nineteen, between William H. Crawford, secretary of the treasury of the United States, of the one part, and Charles Villar, agent of the association of French emigrants, of the other part: and which is commonly known by the name of the "French Grant"—said lot or alotment numbered two hundred and eighty-eight, in the map of the division of said lands, among the individuals of said association, in township twenty of range four, east; otherwise called and known as the N. E., N. W. and S. W. quarter sections of section thirteen, in the aforesaid township and range. Which pieces or parcels of lands aforesaid, orator charged, he sold to the said John M'Kinne, for the sum of two thusand

eight hundred and eighty dollars, which was made payable in the manner and form following, to wit— one hundred dollars in cash, and four promissory notes, each for the sum of six hundred and ninety-five dollars: one payable on the first of March, one thousand eight hundred and twenty-three; one on the first of January, one thousand eight hundred and twenty-four; one on the first of January, one thousand eight hundred and twenty-five; and one on the first of January, one thousand eight hundred and twenty-six: that, as a farther stipulation of the contract of sale, it was agreed, between orator and the said M'Kinne, that the latter should execute to orator, a mortgage of the lands thus sold, to secure the payment of the balance of the said purchase money, remaining unpaid, he, the said M'Kinne, retaining the possession of said lands; without which mortgage, orator charged, that he was unwilling to sell the said lands; but which mortgage was in pursuance of said contract, executed by said M'Kinne, on the twenfifth of May, one thousand eight hundred and twenty-two—a copy of which was prayed to be made a part of said bill: and which was charged to have been recorded in the office of the clerk of the County Court of Greene, on the fourteenth day of January, one thousand eight hundred and twenty-three.

The bill further charged, that three of the said notes had already become due, and were wholly unpaid, as well as the interest thereon; one of which had been sued and prosecuted to judgment, but which remained wholly unsatisfied; that the said M'Kinne had become wholly insolvent since the execu-

5 s & p.          28

tion of the aforesaid notes, and had left the State of Alabama.   That the said M'Kinne, before he left the said State of Alabama, combining and confederating with one William L. Dufphey, for the purpose of injuring orator, he placed the said Dufphey in the possession of the said lands, who, having entered thereon, refused to suffer the same to be disposed of, according to the terms of the mortgage and contract aforesaid, and which mortgage, orator charged, was to become complete on the failure of the said M'Kinne to pay off and discharge either of the before mentioned notes; and which, accordingly, became complete on the first day of March, one thousand eight hundred and twenty-three.   That the said Dufphey some times, denied the existence of any mortgage from the said M'Kinne to orator, of the lands in question; and occasionally averred, that he had purchased the premises of M'Kinne, without notice of the aforesaid mortgage—all which, orator charged to be untrue; and all which was contrary to equity.

The bill, therefore, prayed process to the said M'-Kinne, and the said Dufphey; and a discovery of all and singular the facts charged, and answers on the part of the said M'Kinne and Dufphey, to the several allegations contained in the bill: and further prayed a foreclosure of the said mortgage, and a sale of the premises, for the satisfaction thereof.

The mortgage appended to the bill, as an exhibit, was an indenture of sale, executed between John M'Kinne and Peter Frenaye, on the twenty-fifth day of May, one thousand eight hundred and twenty-two, stipulating a contract of sale of the premises specified in the bill, to the said Peter Frenaye, for the

sum of twenty-seven hundred and eighty dollars; and containing a condition or defeasance, setting out, that if the said John M'Kinne should pay to the said Peter Frenaye, the just sum of two thousand seven hundred and eighty dollars, on or before the first of January, one thousand eight hundred and twenty-six, according to the condition of four promissory notes, bearing equal dates therewith, and executed by said M'Kinne, in favor of said Frenaye, then the same should cease and determine, &c.; otherwise the said sale to be valid; and a sale of the premises to be had in pursuance thereto.

This indenture of mortgage was signed in presence of two witnesses, and contained a certificate of acknowledgment, by M'Kinne, before Basil Meslier, a justice of the peace of the County of Marengo; under which it was recorded in the office of the clerk of the County Court of Greene, as certified by a transcript from that office, dated the twenty-second of September, one thousand eight hundred and twenty-five.

The answer of William L. Duffhey, to the aforesaid bill of complaint, set out, that on or about the twenty-sixth day of January, one thousand eight hundred and twenty-four, respondent purchased of John M'Kinne, three quarter sections of land, within the tract reserved and set apart for the French emigrants, the ultimate title to which was depending upon certain conditions, for improvement and cultivation, and upon other conditions, specified in the act of congress, in relation thereto. That the numbers of the lands so purchased, accorded with, and were, no doubt, those described in the said bill of the com-

plainant: and that the history of the said purchase was as follows—That respondent, being then a resident of the County of Clarke, and being on a visit to his friends, in Greene County; and, having expressed a desire to procure a settlement of lands, in that County, was recommended to visit the lands of the said John M'Kinne, which he was informed were for sale: that, in compliance with this recommendation, respondent did visit the premises on which the said M'Kinne was residing with his family, and was made acquainted with him, having never seen the said M'Kinne before. That, after viewing the lands, respondent was informed by the said M'Kinne, of his desire to sell; that he would take twelve hundred dollars for the premises, being about what it had cost him—at the same time observing, that the lands were conveyed to him, by one Frenaye, a French emigrant, and that of course, the ultimate title depended on a compliance with the terms and conditions of the French grant: and that *his* only deficiency in title, was the omission of the wife of Frenaye to join in the conveyance, and relinquish her claim of dower; but, that Frenaye and family had left the country: and that no hint was given to the respondent by said M'Kinne, but that he had an indefeasible and clear title thereto, subject alone to the conditions of the French grant aforesaid. That, afterwards, to wit, on the day after this conversation occurred, the said M'Kinne and respondent met, and the former having exhibited his title papers, an agreement of sale of the premises was entered into between them, at the price and consideration of twelve hundred dollars; four hundred dollars of

which was to be paid in two annual instalments:
that in compliance with said agreement, the said M'-
Kinne, afterwards, on the twenty-sixth day of Janua-
ry, one thousand eight hundred and twenty-four, exe-
cuted to respondent, a deed of conveyance, of the
lands in question, a copy of which was exhibited
and prayed to be taken as part of the answer : which
deed was duly acknowledged before the clerk of the
County Court of Greene, on the twenty-fourth of
February, one thousand eight hundred and twenty-
four. The respondent expressly denied having re-
ceived intelligence for some time, from the said M'-
Kinne, or any other person, of the lien or mortgage
of the said complainant; but stated, that he went
into possession of the said lands, and was, subse-
quent thereto, informed, by a friend, that there *did*
exist some lien on the lands aforesaid. That, upon
*receiving* this information, he immediately called up-
on the said M'Kinne, and charged him with fraud
in concealing the said mortgage; but that the said
M'Kinne asserted, in relation thereto, that the pro-
posed mortgage was insufficient, and could not inter-
fere with respondent's title. That it was eventually
agreed, between the said M'Kinne and respondent,
that the latter should, in addition to a first payment
of four hundred dollars, in cash, made in conformity
with the original contract, give to M'Kinne, an un-
conditional note, for the payment of eighty dollars,
and receive the two notes, for four hundred dollars
each, which had been executed, for the deferred in-
stalments; and in lieu thereof, respondent under-
took to pay the amount of the said notes, in case the
said mortgage should prove ineffectual : otherwise,

and in case respondent should be evicted, the same should be relinquished by said M'Kinne.

Respondent averred, that no suspicion of the lien ever occurred to him; and that no estimate was made in relation to improvements; but that the purchase was made, unconditionally, and that the price stipulated was the full value of, and a fair consideration for the premises sold. He further insisted on the fact, that the supposed mortgage was acknow-, ledged before only one justice of the peace, which was insufficient to authorise its registration, and passed no notice to him, being an innocent purchaser, for valable consideration. That, even supposing the said mortgage to operate against the respondent's title, yet the period had not arrived, when complainant could take any advantage therefrom : the condition of the same expressly providing that M'Kinne should pay the gross amount of all the instalments, on or before the first day of January, one thousand eight hundred and twenty-six : and which had not arrived. He, therefore, submitted whether complainant could legally institute his suit, before the expiration of that period.

The indenture exhibited in the answer, was a deed of bargain and sale, dated the twenty-sixth of January, one thousand eight hundred and twenty-four, unconditionally, of the lands in question, from M'Kinne to Dufphey, for the price and sum of twelve hundred dollars; witnessed by three persons, and duly acknowledged by M'Kinne, before the clerk of Greene County Court, on the twenty-fourth of February, one thousand eight hundred and twenty-four,

and recorded on the twenty-fifth of February, one thousand eight hundred and twenty-four.

At Fall term, one thousand eight hundred and twenty-five, of Greene Circuit Court, leave was granted by the Chancellor, to the complainant, to amend his bill, and the cause was continued.

At Spring term, one thousand eight hundred and twenty-six, the complainant filed a supplemental bill, averring, that if the period had not arrived before, when he was privileged to file his bill, it had *then;* that the last instalment, due upon the purchase by M'Kinne, has fallen due; and that therefore he was authorised to proceed, and averred other facts, not material.

This supplemental bill, Dufphey also answered, recapitulating numerous facts, not essential to be recorded in this history of the case.

Much testimony was taken in the cause, but, as it did not vary the facts, as disclosed in the bills and answers, it is not specified; except that some attempt was made to fix upon Dufphey, notice of the lien of Frenaye, through a series of publications in a newspaper, between Frenaye and M'Kinne, in 1823, to which paper Dufphey was a subscriber.

At Spring term, one thousand eight hundred and thirty-one, the Chancellor below entered the following decree:

In this case, the first question arising is, was Dufphey a purchaser for valuable consideration, and without notice of Frenaye's mortgage?

It seems to be admitted on all hands, that, though the mortgage was recorded, yet the record was de-

fective, in as much as the probate was taken by one justice of the peace, and not by a judge, or two justices. If, when legally recorded, it is to operate as constructive notice only, then, if defectively recorded, it can not be considered as notice, either actual or costructive. Nor can it be considered as a circumstance sufficient to put the party on an enquiry, unless a knowledge of the circumstance be, in fact, brought home to him. For, the rule is, that constructive notice can not be raised from the mere circumstance, alone, unless the party knows it.

The publication in the newspaper would be sufficient to put the party on the inquiry, and would amount to constructive notice, if a knowledge of the fact were brought home to him. But, though there is a probability arising from Dufphey's being a subscriber to the Cahawba Press, and that the same was regularly sent by course of mail, yet the proof is not sufficient to charge him with a knowledge of the fact.

*Lis pendens*, would be considered as constructive notice, were the object of the suit so manifest as naturally to excite suspicion, and lead the mind to a knowledge of the incumbrance. If the proceedings shew, that the object of the suit was to recover the purchase money for land sold, then the pendency of the action would be sufficient, at least to put a party on the inquiry.

But where, as in the present case, this does not appear, it can not operate as constructive notice, nor is it sufficient to put the party on his inquiry.

It was further insisted, that the inadequacy of consideration, agreed to be paid by Dufphey, for the

land implies a knowledge of the incumbrance, from the fluctuation in the price of lands, and the uncertainty of title at that time; I am not prepared to say, that the price to be paid by Dufphey was so grossly inadequate, as to raise the presumption, that he had a knowledge of the incumbrance, and took the land subject to the mortgage.

I am inclined to the opinion, that all the circumstances, considered either separately or collectively, are insufficient to raise a legal presumption, that Dufphey had notice of the mortgage, when he purchased the land of M'Kinne. But, in his answer, Dufphey admits, that after he had paid four hundred dollars for the land, he had notice of the mortgage, and then made a new and conditional contract with M'Kinne.

The law is, that if he had notice, any time before he paid the purchase money, (and not merely secured it to be paid,) though the deed of conveyance has been executed, he takes the lands subject to the incumbrance, deducting therefrom what had been actually paid before he had notice. Because, in equity, mortgages are favored, and the vendor of real estate has a lien on the estate, for the payment of the purchase money; and it is better, and more just, that a subsequent purchaser, who has not been vigilant, in making the proper inquiry, should loose the advantage of a good bargain, than that the original vendor should loose both his land and the purchase money.

The four hundred dollars paid by Dufphey to M'Kinne, before notice, has a lien on the land, and must be deducted, before the mortgage is satisfied. But, if Dufphey has made no lasting and valuable improve-

ments on the land, and the rents and profits will be equivalent to four hundred dollars, then Dufphey will be entitled to no deduction from the price for which the land may sell, on the score of his lien.

It is, therefore, ordered and decreed, that the cause be referred to the clerk, as master and commissioner, to ascertain the real amount of principal and interest, due the complainant, from M'Kinne; and what is the value of the rents and profits, (exclusive of lasting and valuable improvements made by Dufphey,) from the time at which Dufphey got possession, to the present time: and it is further ordered and decreed, that unless the principal and interest of the debt due from M'Kinne, to the complainant, and all costs, be paid within six months, then the clerk, as master and commissioner, sell for cash, the said mortgaged premises, in satisfaction of the same, he first having duly advertised, as is required by sheriffs, in the sale of real estate: and, it is further ordered and decreed, that if the rents and profits shall be equal to the amount of four hundred dollars and interest, and there shall be an excess, after satisfying the complainant's debt, interest and costs, that the said excess be paid over to the defendant, Dufphey. But if the rents and profits be not equal to four hundred dollars, with interest, then the deficiency be first paid out of the money arising from the sale of the mortgaged premises; and the balance be applied according to the rule above laid down."

From this decree Dufphey took a writ of error to this Court, and assigned the same as cause for reversal.

*Pickens*, for the plaintiff in error—contended, that Chancery would not compel an innocent purchaser to give up the land, where he has paid part of the price and received the title.   Here, Dufphey, (said he,) is entirely innocent.   The only notice received by him, was long after his possession commenced; and had the notice he then received been in time, it would not have been sufficient.—Sugden on Vendors, 522.   Vague reports do not affect a purchaser's conscience; although what is sufficient to put a vendee upon his inquiry, is notice, it must, lead to a *fact*, and this, while the bargain is in progress.   The mortgage insisted on, as constructive notice in this case, can not operate as such, because, if so at all, it was not properly acknowledged; and, had it been, would not have been notice.—2 Bin. 40.

It is well laid down, in all the books, as a rule in Chancery, that when a defendant, without notice, is in possession, upon valuable consideration, he will not be disturbed.—1 Johns. C. R. 300, 575; 9 Ves. 24. And, there is no case, where Chancery has ever decreed, that a defendant, in such situation, should pay more than the balance due by him, to the mortgagor, without fraud.—1 Johns. Ch. Rep. 301,–'2–'4.   Here, the Chancellor below decreed the entire amount due the mortgagee.   In the case last cited, there was constructive notice, which did not exist here.—4 Johns. Ch. Rep. 46; 2 Ib. 158.

It may be said, that Dufphey made a new contract.   But there was no re-purchase.   There was no contract of surrender and rescission.   After Dufphey received notice of the lien, he gave M'Kinne

eighty dollars, to obtain a mere modification of the contract; an insurance of the old contract.

The English doctrine, applicable to pleas, we do not recognise: and we can not be held to the strictness of a plea. Our answer contains all which could be required of a plea.

It may be also said, that where both parties have an equitable title, the oldest must prevail : but, this distinction can not exist—it would not be *equity*.— Frenaye's title, at all events, is less than ours : he took a mortgage only—we, an unconditional title : and, even the title which he had, he failed to record; so that, even upon the principle contended for by the complainant, he is behind us, in diligence, if no more. The principle, that, where an *equitable* estate is purchased, the vendee takes at his peril, can not apply to us ; because this only applies, where the nature of the title appears on its its face.

*Caveat emptor* only applies where a defect is shown to exist, either upon the face of the title, or where notice of an incumbrance is fixed upon the vendee, before he closes the contract. Dufphey must account for his own acts, not those of Frenaye, or M'Kinne. If M'Kinne acted in fraud, who enabled him to do so, but Frenaye, in not regularly recording his mortgage? You cannot then visit upon Dufphey the fraud of M'Kinne or the omission of diligence on the part of Frenaye. He was alike innocent and ignorant of both : and Frenaye himself had put it in the power of M'Kinne to impose a defective title on the world. He therefore cannot ask equity. The suit was prematurely commenc-

ed, and we have the right to an entire reversal of the decree. But I am willing to admit a right of recovery against us, for the amount yet due to M'Kinne, but without costs. This would be equitable; for we are without default. .

*Stewart*, contra. Dufphey after notice, made a new contract as we contend; and now holds under it, because M'Kinne, as admitted in the answer, holds none of the paper of the first agreement.

Now where two purchasers have title, the first in point of time must be preferred. The attitude of an innocent purchaser without notice, is in England the subject of plea, not answer—it must be proved. When a party answers, the complainant must overthrow it, by two witnesses; whereas when he pleads, the defendant must establish the fact plead.—Milford's Pl. 222.

All the equitable principles contended for, apply to legal, not equitable estates. The estate of Frenaye here was only equitable; had it been legal, the answer should have averred it.—Sug. on Vend. 543. The answer should also have averred, that the purchase money had been paid.—2 Atk. 631 : and that no notice was received before its payment.—17 Ves. jr. 290—4 Dessaussure 287.

In all cases, it is essential that the first purchaser be seized in fee. In the case here, Dufphey did not buy from one who even pretended to possess the fee. What then did he buy? A purchaser takes only rights and titles of his vendor ; and this is all the deed purports to convey. It is the duty of the vendee to examine the title of his vendor. Then

all the title M'Kinne had, was that granted by Frenaye, which was a bare equity, and that encumbered by mortgage: this therefore, is all Dufphey could receive.—7 Cranch, 48 ; 1 Wash. C. C. Rep. 79.

Dufphey received notice before all the payments were made. What he has paid he can recover back; because the law prefers that a man shall loose a bargain, rather than that another shall loose a right. Where the purchase is *complete*, the Court will not open it.—3 Atk. 304. And *all* the money must be paid.—2 Atk. 384, 397, 630. So, where a part of the purchase money is paid, and notice is *then* given, it arrests the payment of the balance.—1 Johns. Ch. Rep. 566 ; 3 Pr. Wms. 307 ; 8 Wheat. 449.

In this case, Dufphey has actually secured himself against M'Kinne, by contract, and so *can not loose* one cent; and thus is the decree. Dufphey agreed to pay one thousand two hundred dollars: the value is three thousand dollars. All he paid was four hundred dollars—his use and occupation is worth more than that sum.

There are authorities, it is true, which say that a mortgage defectively recorded, is not as operative as if regularly registered—but they are conflicting, and we may consider it a question open to this Court. If Dufphey had examined the records, he would have found the mortgage, although defective in its acknowledgment; but, in good conscience, it should be notice to him. A vendor of real estate is always favored in equity. By the civil law, he can not be defrauded. A mortgagee is also favored. Whatever is sufficient to put a vendee on his inquiry, is good notice.—Sugd. on Vend. 522. Here M'Kinne adver-

tised the notes in a newspaper, to which paper Dufphey was a subscriber. This is a circumstance from which notice should be implied.

SAFFOLD, J.—The bill was filed in the Circuit Court, by Frenaye against Dufphey, for the purpose of foreclosing a mortgage on the land in question, given to secure the payment of four promissory notes of six hundred and ninety-five dollars each, which fell due at annual periods, from the first of January, one thousand eight hundred and twenty-three, till the first of January, one thousand eight hundred and twenty-six.

Facts charged and admitted by the bill and answer, or sufficiently proved, are the following : That notes were given by M'Kinne, to complainant, in consideration of the land mortgaged—(being three quarter sections.) That the land had been owned and held by Frenaye, under the acts of Congress, (and contracts with the government, pursuant thereto,) in favor of the French emigrants ; but, for which payment to the United States had not been completed, nor had all the other requisites been complied with. That M'Kinne, by virtue of this purchase and conveyance, being in quiet possession, in January, one thousand eight hundred and twenty-four, bargained, sold and conveyed the same to Dufphey, for twelve hundred dollars, of which sum, four hundred dollars were then paid; and two notes, for four hundred dollars each, payable at one and two years thereafter, were given for the balance. That, under this contract Dufphey received possession of the premises, and some additional privileges connected

therewith, and, for a time, peaceably enjoyed the same—having no notice or intimation of the lien now attempted to be established. That, shortly afterwards, he was informed by a friend, of the existence of the mortgage, and thereupon charged M'-Kinne with the fraud in concealing the knowledge of it, from him, who then assured the former, that the mortgage was of no validity, and he would sustain his contract of sale. That it was finally agreed between them, that M'Kinne should give up to Dufphey, the two notes of four hundred dollars each, and that Dufphey should give him his other note, for the unconditional payment of eighty dollars, and should not pay him any more if the mortgage should prevail; but if it was defeated, and the conveyance to Dufphey sustained, he should still pay the eight hundred dollars.

It also appears, that three of the notes given by M'Kinne to Frenaye, which had become due, remained unpaid, and that on one, suit had been prosecuted to judgment, before the filing of this bill, and it was found, that M'Kinne had become insolvent, and left the State. That the mortgage provided, if M'Kinne should pay to Frenaye the sum due, on or before the first of January, one thousand eight hundred and twenty-six, according to the condition of the four promissory notes aforesaid, then the mortgage should be null and void; but, in case of the non-payment of said sum, *or any part thereof, so to become due at the time limited for the payment thereof,* then Frenaye was empowered to sell, &c. rendering the overplus, (if any,) to M'Kinne. That the land had been

considerably improved by Dufphey, and who, from the cultivation of it, had derived extensive profits. That after *part only* of the purchase money had become due to Frenaye, he proposed selling the land under his mortgage, to which Dufphey objected, refusing to permit any entry to be made; in consequence of which, Frenaye, in August, one thousand eight hundred and twenty-five, (which was previous to the maturity of the last instalment,) instituted this suit.

It further appears, that Dufphey, by his answer, among other things, objects, that the suit was prematurely brought—that, if the mortgage was valid, there was no authority to proceed on it, until the first of January, one thousand eight hundred and twenty-six, which was the maturity of the last note thereby secured, and the earliest date at which the mortgage could be considered forfeited. It is shewn, however, that at a term of the Court, subsequent to the last mentioned day of payment, Frenaye applied for, and obtained from the Court, leave to amend his bill, and on this general permission, filed a supplemental bill, charging, that *then,* if not before, the mortgage had become forfeited, as the last instalment was then due, and the demand unsatisfied.

Further, it is shewn, that the mortgage was acknowledged before *one justice of the peace only,* and on this proof, was admitted to record. That Dufphey, by his answer, solemnly and positively denies any information or notice of the existence of the mortgage, or any hint or intimation of the kind, from any source, to excite the slightest suspicion of any

5 s & p.         30

such incumbrance; he objects to the sufficiency of the acknowledgment of the mortgage, insists it furnished no authority for the registration, that consequently the registration was a nullity, and not constructive notice of the lien. The answer also insists, that the price which Dufphey contracted to give, was a fair equivalent for the land, under the incumbrance in favor of the government.

Various other facts are presented by the record, and were urged in argument; but these are all which I consider important to the merits of the controversy.

The decree of the Circuit Court, in substance, is that, unless Frenaye's debt, interest, and all costs were paid within six months, then the clerk, as master, should sell the land, for cash, in satisfaction of the same. That, if the rents and profits should be found, on an account, to be taken, equal to the four hundred dollars paid by Dufphey, and interest thereon, (after deducting therefrom the value of lasting improvements made by him,) and there be any excess, after the payment of Frenaye's demand, such excess only, to be paid to Dufphey. But, if the rents, &c. be not found equal to the four hundred dollars and interest, as aforesaid, then the deficit to be first paid to Dufphey, out of the proceeds of sale, and the balance first to complainant's debt, &c. as aforesaid.

This case having been argued at the last term, a decision was then pronounced by a majority of this Court, affirming the decree of the Circuit Court, with but a slight modification, respecting the costs, and a supposed ambiguity, as to the time from which

the rents and profits should be computed. From that decision I dissented; and, on this re-hearing, am confirmed in my contrary opinion. My views of the case, I will state.

Dufphey insists, that this decree of the Circuit Court is erroneous, in every material point.

Several of the principles embraced by the decree below, (though some of the same have been controverted in argument,) being fully satisfactory to all the members of this Court, may be adopted without comment—by which the field of investigation will be greatly circumscribed. These are, that the contracts of each of the parties, were in fact stipulated, and legally concluded with M'Kinne, to the effect and in the manner charged in the bill and answer, and as stated in the history of the case. That Frenaye's mortgage having been acknowledged before *one* justice of the peace only, who being incompetent to take and certify it, the registration was unauthorised, and does not constitute constructive notice of the lien.[a]—*Heister* vs *Fortner*.[b]—*Frost* vs *Beckman*.[c] [a]Sug Vend 527; 1 Scho & Lef. 157 [b]2 Bin. 40. [c]1 Johns.C Rep. 288. Nor does it appear, that any other notice of it was given to Dufphey, or that any circumstance came to his knowledge, sufficient to devolve upon him the necessity of making inquiry, until after he had concluded his contract, paid the four hunered dollars, and removed to, and acquired peaceable possession of the lands: consequently, to this stage of the negotiation, he is to be regarded as a *bona fide* purchaser, for a valuable consideration, without notice of the prior lien. But afterwards, it appears, he received the notice, and entered into a modification of the contract, as stated, and from the date of this notice,

(so far as notice then was material,) is to be regard-
ed as a purchaser, with notice. That, by the terms
of the mortgage, the day appointed for the forfeiture
thereof, in the event of non-payment, was the first of
January, one thousand eight hundred and twenty-
six; and this suit, for foreclosure having been institu-
ted, as early as the preceding August, the same was
prematurely brought; but, as the Chancellor below,
in the exercise of his discretion, granted leave to the
defendant to amend his bill, and the supplemental
bill was filed, for the purpose of curing this defect,
charging the true date of the forfeiture, which had
then passed; and as no objection was made and sus-
tained, to the nature of the amendment, but the sub-
sequent proceedings have gone on the merits, the in-
dulgence of Chancery will now so far consult the
true merits, as to sustain the suit; but, will consider
its premature commencement as a matter affecting
the *costs*.

Also, it is conceded, that admitting the United
States holds, or, at the time of these contracts, held,
by law, a lien on the land, to secure the original pur-
chase money, and the performance of the other con-
ditions of the grant; yet, as the individual to whom
it was allotted, or his assignee, mediate or immedi-
ate, had, by law, the right to comply with the terms
of the grant, and, by so doing, could legally entitle
himself to a patent, his *interest* or *claim* is to be re-
garded as an inchoate right to the fee, dependent on
his performance of the conditions precedent, or, in
other words, as a defeasible legal title—an estate, to
which the doctrine of *bona fide* purchase, without no-
tice of other incumbrance, is applicable, and peace-

able possession, under such, is a sufficient *seizen* for
this purpose.  See *White* vs *Saint Guirons*.[a]

[a]1Ala. Rep
331.

Then, it remains to be considered, what are the
equitable rights of each of these parties, under their
conflicting claims : has Frenaye's lien become ex-
tinct, in whole or in part?—What protection is due
to Dufphey, and what is the proper disposition of
the costs?

An *equitable* mortgage, or that lien which is im-
plied, under certain circumstances, on the estate
sold, for the purchase money, will bind the *vendee
and his heirs and volunteers*, and all other purchasers
from the vendee, *with notice* of the existence of the
vendor's equity.  Such lien is held, *prima facie*, to
exist in all cases of the sale of real estate, where
there are no circumstances, indicating the contrary
intention: but, the taking a note, bill or bond, with
distinct security, or taking distinct security exclu-
sively by itself, is a waiver of the implied lien: and
the rule is general, that an intervening mortgagee,
or purchaser for a valuable consideration, *without no-
tice* of such incumbrance, will be preferred.[b]

[b]4Kent's C
145, '6, '7.

The lien will be found but slightly, (if in any re-
spect) different, in case of express mortgage, like the
present.

The rule of the English Chancery is, that "where
a man is a purchaser for a valuable consideration,
without notice, he shall not be annoyed in Equity,
not only where he has a prior legal estate, but where
he has a better title, or right to call for the legal es-
tate than the other."  But, by taking a conveyance,
with notice of the trust, as immediate or first pur-
chaser, or, as subsequent vendee, where his vendor

also had the requisite notice, he himself becomes the trustee.[a]

It has also been ruled, that notice is not confined to the time of the contract: for, if a person, who has a lien in equity on the premises, give notice thereof before actual payment of the purchase money, it is sufficient.—See the above reference, (note c;) also *Tourville* vs *Naish*[b]—*Story* vs *Lord Windsor*[c]—*Hardinham* vs *Nichols*.[d]  Or, if the notice be given before the execution of the conveyance, though the purchase money be actually paid, it is also said to be sufficient. Fonb. (same note,) and *Wigg* vs *Wigg*.[e]

The cases above referred to, are mainly relied on, to prove, that the English doctrine requires the subsequent purchaser not only to have contracted without notice of the incumbrance, but, that the conveyance should have been actually made, and *all* the purchase money paid, before the prior lien can be defeated.  These cases, doubtless, give countenance to this mortgagee's lien; but they are not conclusive, on the most material question, in the case under consideration.  The question alluded to is, whether the whole of the purchase money is necessary to be paid, in order to defeat the lien, either in whole or in part.— Neither of these, or any other authority referred to by the complainant's counsel, is conclusive on this point.  Nor can I admit, on principle, that an inflexible rule, maintaining either the affirmative or negative of the proposition, would be safe.

In contracts, where the negotiation has, in all other respects, been closed, it can not be just, that the payment of an inconsiderable portion of the consideration, should give the same validity to the title,

[a] 2 Fonb. b. 2 ch. 6, sec. 2, and note i.

[b] 3 P. Wms. 307

[c] 2 Atk. Rep 630.

[d] 3 Ib 304.

[e] 1 Ib 384.

against a prior lien, that would arise from full payment, except a trivial balance. Other considerations connected with this, are necessary, in determining the equity of many cases. These, I will endeavor to bring to view in the course of my remarks. If the terms of the contract require present payment, and the purchaser, after receiving 'the conveyance, fail to comply, before receiving notice, the vendor would be at liberty to rescind the contract, and of course an incumbrancer may set it aside, and assert his lien, though the unpaid balance be small.

In such case, the argument on which this doctrine rests, would well apply, that the contract and performance are but one transaction, and, until the payment be made it remains incomplete; but where according to the agreement, the conveyance has been duly executed, an essential part of the consideration paid, bond or note taken for the balance at a future day, and no lien retained for it, I would consider the contract as respects the *title* fully consummated, and that the payment or non-payment of the balance could not affect it. The exact proportion of the consideration necessary to be paid to exclude the prior lien, I conceive equally unsusceptible of any peremptory rule, but that it, together with all the circumstances of each case—as the price contracted to be given by the purchaser, compared with the true value of the land—the lapse of time between the purchase and the notice—the value of the improvements made by the purchaser—the cause of the incumbrancer's failure to give notice—his exertions to have done so, and the motives by which he appears to have been actuated, should be left to the

sound discretion of the Chancellor. If, however, the amount remaining unpaid be a main item in the value of the contract, the lien may continue in a qualified sense, without notice. In any case where the lien has been preserved in any degree, I doubt not the competency of Chancery, to stop the payment of any balance of the consideration; and, if the lien be lost on the land, to attach it to such balance, and control the same accordingly.

3 Cond. E.
Ch. R. 773.

The case of *Jackson* vs *Rowe*,[a] has been referred to in support of this lien, and is supposed to sustain the position, that without notice, it continued to exist, until full performance of the contract on both sides. But on examination, it is found, that the only principle decided by the Chancellor, in that case, having any application to this, was, that a *plea* of purchase for a valuable consideration, without notice, must aver that the vendor *pretended to be seized*, not merely *before*, but *at* the respective times of the execution of the conveyance, and of the *payment* of the money. The plea in that case, did aver a consummation of the contract, by full performance on both sides, and that the defendant, at or before the same was done, had no notice of or reason to suspect the existence of the lien. To the sufficiency of the plea, in this respect, no question was made.

It is true, as argued, that by the practice in England, and several of the States of the Union, this defence can only be made by *plea;* but, by our statute, it is rendered equally available, as a part of the answer. As respects the sufficiency of the defence,

whether presented by plea or answer, the American decisions seem to have conformed strictly to the principles adopted in the English Chancery, so far as they are understood to have been fully established. The following cases will shew the light in which the subject is viewed in these States.

In the case of *Cole* vs *Scott*,[a] a tract of land had 2 Wash. R been sold, possession delivered to the vendee, and 141. part only of the purchase money paid, but no conveyance had been executed. After maturity of the balance of the consideration, and a deficiency of personal property, to pay it, the vendor filed his bill, to subject the land to the payment; no bond had been taken for the same, nor was there any express agreement reserving a lien—the land had not been sold by the vendee, but remained in the possession of a mere *volunteer claimant under him*. The Court sustained the lien; but the President, at the same time remarked, that if the vendee had sold to a third person, *without notice*, it would have been lost.

In the case of *Blair* vs *Owles*,[b] the same Court held, [b] 1 Munf. R. that notice of a lien or incumbrance on property, 38. binds the purchaser, if received by him, at any time before the execution of the conveyance; also, that a purchaser, with notice of an annual incumbrance, who had prevented the lawful claimant from enjoying the benefit, was personally liable, in equity, to the value thereof; and, in such case, the purchaser, or the property may be made liable, in the first instance, at the election of the party aggrieved.

In *Bayley* vs *Greenleaf*,[c] Chief Justice *Marshall*, in [c] 7 Wheat. delivering the opinion of the Court, uses the follow- 46.

5 s. & p.                          31

ing language—"That a vendor who has taken no
other security for the purchase money, retains a lien
for it on the land, as against the vendee, or his heirs,
seems to be well settled by the English decisions.—
It is equally well settled, that this lien is defeated by
an alienation to a purchaser, *without notice.*"

The case of *Warmly* vs *Warmly*,[a] is entitled to its
influence, as an authority in this case; but not to the
extent, in favor of the lien, which has been contend-
ed for. That case was so widely different from this,
that the facts need not be given: it is sufficient to no-
tice such of the principles of that decision as are ap-
plicable to this case.

It was delivered by Judge *Story,* who says—"It is
a settled rule, in Equity, that a purchaser, to be en-
titled to protection, must not only be so at the time
of the contract or conveyance, but at the time of the
payment of the money. The answer of Castleman
& M'Cormick, [who were co-defendants and pur-
chasers of the trust property,] does not *even allege*
any such want of notice." On the contrary, it is in
proof, that upwards of three thousand dollars of the
purchase money was paid, not only after full notice
of the anterior transactions, but after the commence-
ment of the present suit. Here, it will be observed,
that, though it is said, that the purchaser, to be pro-
tected, must have been without notice, both at the
time of the conveyance, and payment of the money;
it is also said, the answer of the defendants did not
even allege any such want of notice—from which, I
infer, the Court did not consider there was 'any *deni-
al of notice, at the time either was done;* and the rule
is well settled, that no one can claim the benefit of

a 8 Wheat.
422.

this defence, unless he positively and absolutely aver, by plea or answer, (according to the practice of the Court,) that he was without the requisite notice.— Nor does the opinion define whether the whole or part of the consideration must be paid without the notice. It only says, in that case, that part of the purchase money was paid, after full notice, even after the commencement of the suit; but this appears to have been mentioned, rather as a circumstance, from which, (with the other facts,) to infer the existence of the same knowledge of the nature of the transaction, *during the whole of the negotiation and the pur chaser's voluntary participation in the alleged fraud*, than as an independent fact, sufficient to invalidate their title. The case does not maintain the principle, that where a *bona fide* contract has been entered into, for the sale of lands, the conveyance made, and an essential part of the purchase money paid, before notice of any incumbrance, that the circumstance of part of the consideration remaining unpáid, when the notice is received, will vitiate the title; nor that it would affect it in the same manner, or to the same extent, as if the notice had existed previous to entering into the contract.

The case of *Frost vs Buckman*,[a] is confidently re- [a]1 Johns.C Rep. 288. lied on by the counsel for Dufphey, to sustain the principle, not only that a defective or unauthorised registration of a mortgage does not create constructive notice thereof, but, also, that if such purchase be fairly made, and part only of the consideration paid, before notice of the prior lien, Chancery will protect such purchaser; and will decree in favor of the lien, only that the unpaid balance of the purchase money

shall be appropriated towards the satisfaction thereof. As respects the facts of the case, it is sufficient to say, the bill was filed by *Frost and others*, as purchasers under *Corl*, who was the vendee of Beckman, and to whom, about the time of his purchase, he had given a mortgage on the land, to secure the purchase money. The mortgage purported to have been registered under the law of New York, which required that the register should contain, not the mortgage at large, but the essential parts of it; and, among other specified parts, "the mortgage money, and the time or times when payable." The sum for which the mortgage was given, was three thousand dollars, but by mistake, it was entered in the registry, three hundred dollars. The subsequent purchasers did not appear to have had actual notice of the mortgage, until some time after their respective purchases, and the payment of part of the purchase money; and after they were informed of the mortgage, as registered, a considerable time more elapsed before they were apprised of the mistake in the sum. During this time valuable improvements had been made on the land, by the purchasers, and farther payments made, either in cash, or by renewing the bonds or notes to innocent assignees of those previously given. Afterwards, the purchasers considering themselves chargeable with constructive notice, to the amount of the three hundred dollars mentioned in the register, proposed to Beckman to pay him that sum in discharge of his lien, which the latter refused, and insisted on payment of the whole three thousand dollars. On refusal of the purchasers, Beckman was proceeding to sell the land, in satisfac-

tion of his mortgage, when the former filed their
bill, enjoining the sale, and praying relief from the
larger amount of the alleged lien.

In pronouncing the decree, the Chancellor re-
marks, " that the register is notice of the contents of
it, and no more, and that the purchaser is not to be
charged with notice of the contents of the mortgage,
any farther than they may be contained in the regis-
try." Again, he says—" The question does not ne-
cessarily arise, in this case, how far the *unauthorised*
registry of a mortgage, as one made, for instance,
without any previous legal proof, or acknowledg-
ment, would charge a purchaser with notice of the
mortgage. The better opinion, in the books, seems
to be, that it would not be notice; and that Equity
will not interfere in favor of an incumbrancer, when
he has not seen that his mortgage was duly regis-
tered."

On the point more material to our purpose, he says:
" It is an established rule, in Equity, to give no assis-
tance against a purchaser for a valuable considera-
tion, without notice; and cites *Walwyn* vs *Lee.*[a] He [9 Vescy 24]
has equal claims upon the equity of the Court. But
whenever actual notice of the true sum in the mort-
gage can be brought home to the purchaser, he is,
*from that time, so far as the former purchase is left*
*incomplete, either as to the deed, on the one hand, or as*
*to the payment on the other, bound by the prior equita-*
*ble lien, and all subsequent payments by him, are*
*made in his own wrong, so far as the rights of the*
*mortgagee are concerned.* As soon as notice is recei-
ved, it arrests all further proceedings, towards the
completion of the purchase and payment, and, if per-

sisted in, they are held to be done in fraud of the equitable incumbrance."

These are the principles which that Court considered sustained by the English cases, which are mainly relied on, in behalf of Frenaye.—*Wigg* vs *Wigg*[a]—*Story* vs *Lord Windsor*[b]—*Hardinham* vs *Nicholas*[c]—*Tounville* vs *Naish*[d]—previously noticed.

[a]1 Atk. Rep 384.
[b]2 Ib 360.
[c]3 Ib 304.
[d]3 P. Wms. 306.

And the Chancellor further held, that whatever payments were made upon the purchase, before notice of the true mortgage, ought to be protected against any farther sum than that contained in the registry of the mortgage, and that any payments to an indorsee of Cori, the vendor to Frost, before notice, were the same as payments to him; or, that if any part of the debt thus created was changed in the hands of a *bona fide* assignee, by the purchasers giving new notes and taking up the old, before notice, he ought to be allowed for this also, as payment, because he has extinguished so much of the old debt, and become absolutely bound to the new creditor.

Here, the facts, that though an essential part of of the consideration was paid without notice, it was the minor portion—that the balance has been adjusted between the parties, by a conditional agreement; according to which, this decree may discharge Dufphey from any further liability to M'Kinne, his vendor; and that the estimate of the value of the land, in the two sales, and in the opinion of the witnesses, has varied from one thousand and two hundred dollars, to two thousand eight hundred and eighty dollars, are circumstances which I think entitled to material influence in the decision of this case.

In reference to the latter fact, it may be said, if

the land be worth only about the price agreed on by Dufphey, and he be refunded the amount paid with interest thereon, and be secured in the benefits of his bargain, so far as not to be treated as a tenant or trespasser, during the litigation of the conflicting rights, his actual loss can be little or nothing. If, on the contrary, the land be worth near the sum for which Frenaye sold it, Dufphey can be indemnified, except in the *partial loss of an advantageous bargain*, (to which I consider him subject,) and still leave a valuable lien in favor of Frenaye.

To this, when it is considered the failure to preserve the entire lien, is attributable to no intentional fraud, or violation of moral duty, it would appear Frenaye is equitably entitled. The eighty dollars contracted by Dufphey, after notice of the mortgage, was a risque voluntarily encountered, of which no notice can be taken.

The effect of the authorities which I have reviewed, and all others cited in argument, I conceive to be, that if neither a legal conveyance has been executed, or any part of the purchase money has been satisfied, before notice of the lien, Equity will arrest the transaction, and sustain the entire lien, with as little prejudice to the purchaser as the case will admit of, and his merits require. But, if the purchase has been fully consummated, in all other respects, except that a part only of the consideration remains to be paid, the Chancellor should exercise a sound equitable discretion, either to sustain the incumbrancer's lien on the property, in part, giving the purchaser a prior lien, for the amount paid without notice ; or to consider the lien on the premises extinct,

and attach it to the unpaid balance of the conside-
ration.

Here, after Dufphey had made his partial payment,
and received possession of this land, it was incum-
bent upon him, with reference either to his first or
second contract with M'Kinne, to contest the validi-
ty of the lien of which he had received no previous
notice, and during this time it was to have been ex-
pected he would cultivate the land, and not as a te-
nant, but as the owner thereof. That the land may
have been enhanced in value, by means of perma-
nent improvements made by Dufphey, during his cul-
tivation of part of the soil, and yet, that the profits,
during the ten years, may have exceeded the value
of the improvements, I would suppose by no means
improbable. If so, the conclusion would be most er-
roneous, that a settlement of lands must be deterio-
rated in value, from the improvement and cultiva-
tion of it, in proportion to the value of the rents and
profits.

The price contracted to be paid by Dufphey,
though moderate, compared with the price to M'-
Kinne, is not, from the testimony, considered so
inadequate as to prejudice the title of the former.
Then, had he paid the whole of the considera-
tion, under the same circumstances that he paid
part, he would have been secure, not only in the
temporary rents and profits, but in all the advan-
tages of the permanent title. If the rule of Chan-
cery subjects his purchase to defeat, on the ground,
that part of price was not paid before notice of the
prior lien, it does not follow that he should be sub-
jected to the more rigid rule, of being chargeable

for the rents and profits as a mere tenant, when he, in common with most other persons, may have deprecated that relation, as the most unpleasant, and unprofitable. Suppose, instead of the four hundred dollars, he had paid one thousand one hundred dollars, of the one thousand two hundred dollars, consideration, and that the rents and profits could be estimated at the one thousand one hundred dollars, above the value of the lasting improvements, yet, that by means of his improvement, notwithstanding the cultivation, the value of the land had been increased—would it be just that his accounts should be thus balanced, and he turned adrift, when the early payment of only one hundred dollars more, would have rescued him from the humble condition of a tenant, and constituted him permanent lord of the premises, worth several thousand dollars? Such a principle would appear much better adapted to the *rigor of the common law*, than to the mild system of *equity*, whose province it is to balance justice, with a steady hand.

Such, I conceive to be the principle of the decree rendered below, and which had the sanction of a a majority of this Court at the last term.

The circumstance, that the proportion paid in this case, was less than in the case supposed, does not remove the objection to the principle. I would even hold, that if Dufphey had made any permanent improvements on the land, previous to the time he received notice of the lien, and which now enhances the value of the land, he should be refunded for his expenses, so incurred, according to the present value

5 s & p.          32

of such improvements ; but, as the time he so held, was very short, and it does not appear that such improvements were made, it is deemed unnecessary to make any provision on this point.

As respects improvements, made since the notice, as Dufphey knew at the time, that his title was subject to be contested, under the facts as here stated, and as he was, at the same time enjoying the profits of the premises—whatever improvements he has erected, must abide the destiny of the land.

From these views it results that some other principle of decision must be adopted than that which governed the majority of this Court at the last term; and I think there is one better sustained by the authorities, and which has the higher sanction of natural equity and justice. It is, that Frenaye now has only a *qualified lien* on the land, but for which it must be sold unless his debt be otherwise paid within a reasonable time ; yet that Dufphey has a prior claim to the amount of the four hundred dollars, with interest thereon, which must be first satisfied out of the same property.—That Freayne for his failure to preserve his earlier lien, by a legal registration, and for the premature commencement of his suit, be charged with *all costs*. I would therefore decree, that the Clerk of the Circuit Court, as master and commissioner in Chancery, be directed to compute the amount due to each of the parties— that he advertise the land for sale, giving forty days notice thereof in two newspapers, published nearest the place of sale, which shall be at the Court house of the county in which the land lies. That he sell the same at auction, and apply the proceeds

as mentioned, first refunding Dufphey, and then pay-
ing Frenaye, so far as the proceeds may go; and
should there be any remaining balance, that the
same be rendered back to Dufphey: and that Fren-
aye pay all the costs of this Court and the Court
below. Provided, that the sale take place in the
month of May next, and if the amount of Frenaye's
mortgage money be paid by Dufphey on or before
the day of sale, the same shall be dispensed with,
and that Dufphey be by virtue of this decree and
said payment quieted in his title to the premises in
question.

A majority of the Court, perhaps all, *now* con-
curring in the *result*—let a decree be entered accor-
dingly.

THORNTON, J.—In the decree pronounced in
this case, the Court is unanimous, and on the points
raised and discussed in the opinion filed, the lumi-
nous view of Judge *Saffold*, is cheerfully adopted by
the other members of the Court. There is one point,
however, upon which the majority feel disposed to ex-
press their views; because the present decision of it is
at variance with the doctrine contended for, both on
the one hand and on the other, in the argument at
the bar.

It was insisted, on the one hand, that the notice of
Frenaye's mortgage, though unregistered, reaching
Dufphey before he had paid all the consideration
money of his purchase, as well as obtained the deed
of conveyance, the land should be sold, irrespective
of any negotiations between him and M'Kinne, and
its proceeds all applied to the satisfaction of Fre-

naye's mortgage, if so much should be realised from the sale, and nothing but the residuum, if any, be paid to Dufphey; giving him the option, in the mean while, to pay the mortgage money. On the other hand, it was contended, that, as the notice was not given, till after a considerable portion of the purchase money had been paid, by Dufphey, and his legal title obtained, all the complainant could demand, was the balance of the purchase money, which was due from Dufphey to M'Kinne.

Now, our decree conforms to neither of these opposite views—and, as both were contended for upon authority, which seemed, I acknowledge, to maintain the respective doctrines, I feel it due, to furnish distinctly, the reasons of the Court, on the point, as intended to be settled by the decree.

The doctrine contended for, by the counsel for Frenaye, is supposed to be deduced from the decided cases referred to—as laid down by Sugden, (p. 520,) thus: " Notice before actual payment of all the money, although it be secured, and the conveyance actually executed, is *equivalent* to notice before the contract."

If this sentence be understood to mean, notice before payment of *all* the money, though it be *all secured*, and the conveyance be executed in fact, it presents a proposition entirely equitable to my apprehension; because, not being compelled, in such a case, to pay a single sous to the vendor, no injury can be done to the second purchaser. If, however, it mean, that though part of the money be paid, before notice, and the deed executed, notice will be equivalent, in such a case, to notice before any con-

tract, it is not conformable to my views of equity, unless the words, "*equivalent to notice before the contract,*" be interpreted thus—that, as notice before any contract, stops or prevents the party from moving towards the *purchase,* so, notice, at the supposed stage of the transaction, stops or prevents him from moving any further towards the *completion* of the purchase, and, in that sense, is equivalent to notice before the contract—the question here arises between a mortgagee, who has failed to record his mortgage in the time prescribed by the act, and a purchaser, who, without notice of the mortgage, had contracted for the mortgaged premises, paid part of the purchase money and secured his conveyance, before he had any notice of the incumbrance.

The provision of our statute is, that such mortgage shall be *void* and of *no effect,* unless duly recorded, as against a subsequent *bona fide* purchaser, without notice. Now I concede that from analogy to the doctrine established in equity, concerning innocent purchasers without notice, the character of purchaser must be *completed;* that is, that all the money must be paid, and the title deed received, before notice, in order *to avoid* and *render of no effect* the prior mortgage. The total defeat of all his security can only be effected by the completion of the second purchase. But on the other hand, I feel sustained both by reason and authority in this position, that his security in its extent, may be *affected,* though not *annihilated,* by *bona fide* acts of a second purchaser, not amounting to a completion of the character of purchaser. When it is conceded that the rights of the prior mortgagee, may be *totally defeated* by the

honest completion of the contract of purchase—that is, if Dufphey in this case had paid the remainder of the purchase money, his purchase would have been fully maintained, I cannot perceive upon what principle his conduct at any particular stage of its progress, and his rights thus *far acquired*, can be impugned. If he could by taking the conveyance, and paying *all* the purchase money, have *totally* defeated the mortgage, and maintained his purchase, is it not demonstrably clear, that upon principle, his honest advance *to part payment*, and receiving the conveyance, should operate proportionably upon the rights of the mortgagee. If it would be unjust to make Dufphey lose the whole, advanced in this purchase, would it not be equally unjust to make him lose any part, advanced in the same good faith? It seems so to my apprehension. The situation of Dufphey, is surely entitled to as full a share of the indulgent consideration of the Chancellor, as Frenaye—if not, his character as complete purchaser, would not be so peculiarly regarded, as it is admitted on all hands, it is in Equity.

It cannot be predicated with certainty, of any of those parties, that they acted *fraudulently*, but of M'Kinne. But, it must be admitted, that the conduct of Frenaye is, at least, highly neglectful; and, if Dufphey were not indemnified by the decree of this Court, from all loss, he might well impute to Frenaye, if not a participation in the fraud of M'Kinne, at least the negligence of leaving in his hands a weapon, whereby he might inflict an injury on the community.

The act of registration gives a peculiar privilege

to Frenaye, of perfect immunity, from the date of his mortgage, until the time allowed for recording it. For that indemnity, it ought to be exacted of every mortgagee, that he then comply with its requisitions, and at least, if he omit to do so, the injury which is done by the omission, ought to be borne by him alone.

Here no diligence could have protected Dufphey. His vendor was in possession of the land, and of the muniments of title. *Caveat emptor* does not apply to him. The deeds were in his vendor's possession, and the only source of knowledge to him, of the latent equity of Frenaye, was from the registration, which the law enacts, but which Frenaye has omitted, or from personal communication.

I concede, that notice is the only object of registration, and that notice actually given, is equivalent, at least with registration, which is only constructive. The failure to record in time, is no penal forfeiture; but the notice actually given, shall save all the rights, which have not been honestly acquired by another, during the dormancy of his claim. Whenever it comes to light, from that moment, I would say, it shall be enforced as far as it can consistently with the principle, *sic utere tuo, ut alienum non lædas*.

How, then, can the lien, in this case, be used, so as not to injure Dufphey. In no other way, (without giving the notice a retro-active operation,) but by considering it, though not *defeated*, yet *impaired* to the extent of the honest advance, made by Dufphey, upon the same *subject matter*.

The character of purchaser not having been acquired by Dufphey, in the meaning of the act, so as

to render *void* the mortgage, I consider it still in life, and binding; to be enforced, however, subject to the honest advance made by Dufphey, upon the same subject.

I have had less difficulty, in reconciling the decree pronounced in this case, with the decisions referred to as sustaining the doctrine contended for, by the counsel for Frenaye,[a] than in reconciling it with those cases, which, on the other side have been adduced, to maintain the position, that the purchase by Dufphey ought to be maintained; and that the only relief afforded to Frenaye should be a lien upon the balance of the purchase money, due by Dufphey to M'Kinne, at the time of the notice. The establishment of this latter doctrine does, in effect, destroy the *lien* in toto, as it regards the subsequent purchaser; and only leaves it to be enforced against his vendor, by subjecting his funds, in the hands of such subsequent purchaser, to the payment of the residue.

The prominent case referred to, and relied upon, as sustaining this doctrine, is the case of *Frost* vs *Beckman.*[b]  There, there was a mortgage for three thousand dollars; but, by mistake in the registry, entered as for three hundred dollars. The mortgagor sold without communicating the fact of any mortgage whatever. The lien for the three hundred dollars was holden to be clear, and it was further held, that the actual mortgage should also bind the land; so that it was only to be relieved from it, by the payment of whatever amount of the purchase money, was due at the time of the notice given to the subsequent purchaser, of the actual mortgage. The doctrine is laid down, that the notice arrests any further

aSee Sugd. on Vend. 520; 8 Wheaton 288.

a1Johns.C. R. 288

proceedings towards the completion of the purchase, after the notice, and that any payments, made afterwards would be in his own wrong.

The decree orders an account to be taken, to ascertain what amount was due from the subsequent purchaser, at the time fixed upon as the date of the notice; and declares that the land be only relieved from the mortgage, by the payment of *that amount*. The same result would always be arrived at, by pursuing the principles of that decree, and of the one pronounced by this Court, whenever the land had been sold for its full value; for, in such case, by the principle of both decrees, the land is only subjected to the mortgage, to the extent of its value, after deducting *bona fide* payments, made by the subsequent purchaser.

If, in the case in Johnson's Reports, the sale from Cost to Frost and Goddard, was for the full value of the land, and the doctrine be settled, that they shall be indemnified to the amount paid before notice, the balance due would be all that the mortgagor could have obtained—and it was clear equity, to require only that balance to be paid, to relieve the land from the mortgage. But the result would be widely different from the two decrees, if the decree in *Frost* vs *Beekman* is understood as applying universally, equally to cases where the subsequent sale was for its full value, as where it was for a very inconsiderable portion of its value.

The decree in *Frost* vs *Beekman* extended, so as to embrace a case of the latter description, is irreconcilable with the principles which we feel bound

5 s. & p.            33

to adopt, and which we sanction by the decree in this case. We mean to enforce the doctrine, that the lien in this case, as the whole of the purchase money was not paid by the subsequent purchaser as well as his conveyance obtained prior to notice, still exists upon the land; but that it must yield, *pro tanto* as to the *bona fide* payments of such subsequent purchaser.

Let us consider the relative situation of the parties, and what adjustment of the difficulty, arising in such cases, would be most conformable to equity, and best calculated to promote fair dealing and good faith in the community. If that which we propose, best subserves those ends, and is not forbidden by some fixed rule or precedent, which we are bound to respect, then we should not hesitate to adopt it.

The holder of the prior claim, may be the original vendor of the land, who has not been paid a sous for his property, but has taken a mortgage for the purchase money; he may be a mortgagee for a sum loaned; or he may be a vendee, with bond for title.

In this case, it is not certain, in what predicament Frenaye stands, though, as I consider the case, it makes no manner of difference, whether his mortgage was taken to secure the purchase money, or money due to him, upon another score. In every such case, confidence is repoosed in the mortgagor, vendee or vendor. He is, in fact, a trustee, though of a secret trust. In breach of good faith, finding that he can impose upon some one, and lawlessly realise something by the sale of the premises, he proceeds to do so. Here, it must be obvious, that, generally this second sale will be made, under circumstances

calculated to prevent its full value from being obtained. The vendor, knowing that publicity may defeat his fraudulent purpose, offers it to but few. Thus the market is limited. Fearing detection, despatch is required, and to insure a sale he sells for much less than he knows the vendee, on inquiry, would be willing to give; for inquiry might disclose the project, and thus defeat his illicit design.

Under these circumstances, a contract is made with an honest and *bona fide* purchaser, who sees the vendor in possession of both the land and title papers. A profitable contract is offered to him, and as delay might interrupt it, he *honestly* co-operates in the fraudulent haste of his vendor, and closes the bargain.

Now, if all the money be paid, and the deed executed—by all the authorities, the sale is complete, and all prior claims are totally defeated. If, however, the transaction be not closed—if the whole of the purchase money be not paid, on the one hand, and the deed executed, on the other; and before such consummation, he is notified of the prior claim, is it a matter of greater hardship to him, that he should be there arrested, indemnified for his misplaced confidence, but deprived of a great bargain, than that the prior claimant should be bereft of every thing? We say to the subsequent purchaser, in the language of *Lord Hardwick*,[a] " You can not be hurt." [a]1Atk.538; 3Ib.304. If the vendor is insolvent, it is the loss of the prior claimant, for you shall be indemnified to the extent of all your advances; but, not being a *complete purchaser*, you can not claim the profitable bargain which you proposed to yourself, as its enforcement

would injure one equally honest with yourself,
though not so alert in his dealings.

It will not fail to be seen, by close observation,
that the equitable principle endeavored to be enforc-
ed by this opinion, must sometimes require a differ-
ence in the details of the decree, according to the
peculiar features of the case. Suppose, for example,
that in this case, in addition to the money actual-
ly paid by Dufphey, he had, with the same good
faith, prior to notice, invested large capital in im-
provements, as in the erection of machinery, &c.;
and that the sale of the premises, thus ameliorated,
would bring the amount of the mortgage, though,
without the improvements, they would be worth no
more than the price agreed to be given by him.—
Here, compensation for the improvements, must, in
some way be made. If a sale were ordered, in the
event that the second purchaser did not pay off the
mortgage, which he certainly would not do, in the
case supposed, it would be impossible to determine
how much of the sale money was to be considered
as produced by the improvements, and how much by
the land, exclusive of the improvements.

I merely make this suggestion, to shew, that, in
in pursuing the equitable principles advanced in this
opinion, a difference in the details of the decree must
be made to suit the exigencies of the case in judg-
ment.

In the case above cited, (from 1st Johns.,) it was
admitted, that *very valuable* improvements were
made by the second purchasers, before notice ; and
much embarrassment might be avoided in such a

case, by adopting the sale to the subsequent purchaser, as the value of the land, exclusive of the improvements; and decreeing the balance due at the time of notice, to be paid to the prior claimant.

In none of the cases, cited by the counsel for Frenaye, does the question arise, as here, from the insolvency of M'Kinne—who is to lose the amount of the amount of money actually paid by the second *bona fide* purchaser? It is often decided, that, the contract not being completed, by the payment of all the consideration money and the execution of the deed—the plea of innocent purchaser, &c., can not be maintained, so as to defeat in *toto*, the prior claimant; but the question, who must lose the honest payment, is not expressly raised, and decided, in those cases.

In a case, in 5th Litt. 62, the defendants relied upon the plea, and had paid only two thousand dollars of the purchase money, before notice: they, there, however, filed a cross bill, and prayed a decree against the fraudulent vendor, who had sold the same premises twice. The Court overruled the plea, on the principle that the purchase was not complete, only part of the money having been paid before notice. But the question, as to the payment already honestly made, being allowed to be satisfied out of the land, was not raised, in as much as the defendants sought, by a cross bill, its re-payment, from the fraudulent vendor, to which they were clearly entitled.

If, instead of that feature of the case, the insolvency of the vendor had been alleged and proven, and a repayment of the amount honestly advanced,

had been insisted on, as a condition precedent to the surrender of the legal title, obtained from the vendor, the question would have arisen directly, and I can not doubt but the decree would have been in conformity with the principles herein recognised—that the sum thus honestly advanced, should become a preferred lien upon the land. If the vendor is solvent, his liability may be enforced by either party, and it is not very material, in that case, who shall be thrown upon him.

But, if insolvent, as here, the question is, who, of two innocent persons, shall lose. The doctrine, "*qui prior est tempore, portior est jure*," only applies where, in other respects, the parties are equally faultless.—In such a case as this now under the consideration of the Court, I would say, he should lose, who, by a compliance with the law, requiring registration, might have protected himself; and not he, whom no diligence could have protected.

It is not necessary, in this case, nor do we mean, to say, what would be our determination, in a case, where the title or claim of the person assuming the attitude of first purchaser, was an equity merely, which our statutes of registration do not embrace—as, for example, the equitable lien of a vendor, without mortgage for the purchase money, he having made title and given possession. We acknowledge, that the preponderance of our inclination, is to extend the principle, in this decree, to that class of cases; in as much as in all such, there is a looseness of dealing, very like the omission to record, in the present—which is calculated to enable a fraudulent

vendor, to impose upon the community.    But, as a modest caution is, in our opinion, the safest observance of a judicial tribunal, we forbear any anticipated judgments.

LIPSCOMB, C. J. — This opinion also contains the views of the Chief Justice, as expressed, in an opinion delivered by him, upon a former argument of the cause—which need not be published, as they are substantially the same.